**Jordan K. Cameron (12051)**
  jcameron@djplaw.com
**DURHAM JONES & PINEGAR, P.C.**
3301 N Thanksgiving Way, Suite 400
Lehi, Utah 84043
Telephone: (801) 375-6600
Fax: (801) 375-3865

<u>**Attorneys for Plaintiff XMission, L.C.**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| XMISSION, L.C., a Utah company,<br><br>     Plaintiff,<br><br>vs.<br><br>ADGENICS (DBA AGSTRACKER.COM), a Florida company, and DOES 1-5,<br><br>     Defendants. | **COMPLAINT**<br><br><br><br><br><br>Case No.: 2:17cv00073 TC<br><br>Judge Tena Campbell |

COMES NOW Plaintiff XMission, L.C. ("XMission"), and complains and alleges the following:

PARTIES, JURISDICTION AND VENUE

1.   Plaintiff XMission is a Utah limited liability company with its principal place of business in Salt Lake City, Utah, and at all relevant times hereto was duly registered and licensed to do business in the State of Utah.

2.   Defendant AdGenics, LLC is a limited liability company with an address in Florida. However, there is no business registration in the state of Florida for a company called AdGenics so the state of registration is unknown. AdGenics does business as agstracker.com.

SLC_3106146

3. On information and belief DOES 1-5 are individuals and companies doing business in association with the above named-defendants, either as shareholders, officers, members, affiliates and/or publishers, some or all of whom are alter egos of the named Defendant.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), for violations of the 15 U.S.C. §7701 *et seq.* (CAN-SPAM Act of 2003), and pursuant to 15 U.S.C. § 7706(g)(1) (original jurisdiction) for cases involving a civil action by an internet access service adversely affected by a violation of 15 U.S.C. §7704(a)(1), 15 U.S.C. §7704(b), or 15 U.S.C. § 7704(d), or a pattern and practice that violates subparagraphs (2), (3), (4), and/or (5) of 15 U.S.C. § 7704(a).

5. This Court has personal jurisdiction over the Defendants because the Defendants, and each of them, are residents of the state of Utah, are businesses organized and existing under the laws of the state of Utah, and/or because Defendants have purposefully availed themselves of the privileges of conducting commercial activity in the forum state, in part, through the sending of thousands of commercial emails into the state, and the exercise of jurisdiction is reasonable since Defendants should have known that they would be subject to the jurisdiction and laws of the forum state when they sent, or caused the commercial emails to be sent to customers of an email service provider located in Utah.

6. Additionally, and more specifically, a number of the commercial emails in question appear to have been sent from computers located within Utah.

7.      Venue is proper pursuant to 18 U.S.C. §1391, as a substantial part of the unlawful actions by the Defendants, and each of them, occurred in this judicial district.

## GENERAL ALLEGATIONS

8.      XMission was founded in 1993 as Utah's first Internet Service Provider ("ISP").

9.      From its early days as a private, Utah ISP, to its current role as a global business Internet provider, XMission has expanded its technical offerings to include sophisticated cloud hosting, web hosting, email service and hosting, collaboration tools, business VoIP phone service, and high speed internet connectivity solutions including optical Ethernet, copper and fiber.

10.     Throughout its history, XMission has also worked with hundreds of Utah's nonprofit organizations by providing free web hosting services, and by sponsoring a variety of community-based events and facilities.

11.     XMission is a widely known and well-recognized ISP in Utah.

12.     XMission owns all the servers, routers, and switches on its network through which it hosts and provides its Internet access services for its customers.

13.     XMission has an expansive network and infrastructure, which it has had to consistently update, upgrade and augment in order to combat ongoing SPAM problems.

14.     XMission is the sole owner of all its hardware, and has complete and uninhibited access to, and sole physical control over, the hardware.

15.     As a legitimate and leading ISP, XMission is a bona fide Internet Access Service ("IAS") as that is term defined under 15 U.S.C. §7702(11), 47 U.S.C. §231(e)(4).

3

SLC_3106146

16. XMission provides Internet access services to both commercial and residential customers.

17. The email accounts hosted and served by XMission include email accounts owned by third-party customers of XMission, email accounts owned by employees and/or customers of XMission's third-party customers, email account owned by employees of XMission, and also email accounts owned by XMission itself.

18. For purposes of this Complaint, Spam is defined as commercial electronic mail messages ("email") that violate the CAN-SPAM Act in one or more ways.

19. Over a short period of time in 2015, AdGenics sent or caused to be sent at least 16,376 commercial emails to XMission customers.

20. On information and belief, each of the 16,376 emails is Spam.

21. The Spam emails independently and collectively adversely affected XMission, and independently and collectively contributed to an overall Spam problem suffered by XMission.

22. AdGenics is an "initiator" of the spam emails messages as it either transmitted or procured the transmission of the emails in question as such term is defined in 15 U.S.C. § 7702 and 7706(g)(2).

23. On information and belief, AdGenics worked, or acted in concert, with various other Does to send additional Spam emails that XMission has been unable to connect directly with AdGenics due to the misleading nature of the information in the emails.

24. On information and belief, various of the Does 1-5, are "initiators" and/or "senders" as such terms are defined in the CAN-SPAM Act, as each of them, in some way,

benefitted from the advertising in the spam emails and/or initiated or procured the emails in question.

25.     Each of the emails is a commercial message and contains commercial content.

26.     The emails, and each of them, were received by XMission on its mail servers located in Utah.

27.     Throughout its business, XMission has expended well in excess of $3,000,000 in hardware acquisition, maintenance and related expenses to increase capacity to deal with increased Spam and related harm, Spam filtering expenses, and employee time in dealing with problems caused by its receipt of Spam generally.

28.     XMission expends approximately $100,000 to $200,000 per year in dealing with Spam related issues and associated employee time, exclusive of attorney fees.

29.     The harm XMission continues to suffer, as the result of its collective Spam problem is much more significant than the mere annoyance of having to deal with Spam or the process of dealing with Spam in the ordinary course of business (i.e., installing a spam filter to discard Spam).

30.     The harm XMission suffered, and continues to suffer, is manifested in financial expense and burden significant to an ISP; lost employee time; lost profitability; the necessity to purchase and dedicate equipment specifically to process Spam that could otherwise be dedicated providing internet access services; harm to reputation; and customer and email recipient complaints relating to Spam generally, and at least 6,275 customer reports of Spam pertaining to the emails identified herein.

31.     Each of the emails in question violates one or more CAN-SPAM provisions.

SLC_3106146

32. The majority of commercial emails received by XMission, including the emails in question, violate the CAN-SPAM Act in one or more ways, and contributed to a larger Spam problem.

## FIRST CAUSE OF ACTION
**CAN-SPAM ACT, 15 U.S.C. § 7704(a)(1)**

33. Each of the previous paragraphs is realleged herein.

34. The CAN-SPAM Act makes it unlawful to send email messages that contain, or are accompanied by, materially false or materially misleading Header Information. 15 U.S.C. § 7704(a)(1).

35. An email header is materially misleading when it impairs the ability of an Internet access service processing the message on behalf of a recipient to identify, locate, or respond to a person who initiated the electronic mail message or to investigate the alleged violation, or the ability of a recipient of the message to respond to a person who initiated the electronic message.

36. Email headers can be materially misleading in many ways, including as examples when Header Information includes: false sender email accounts; false sender names; false sender email addresses; header information that is registered to unrelated third parties; altered or concealed header information that impairs the ability of a party processing the message to identify or respond to the transmitting party.

37. Email headers can be materially misleading in many ways, including as examples when Header Information is accompanied by: false WHOIS information; concealed WHOIS information; WHOIS information that that impairs the ability of a party processing the message to identify or respond to the transmitting party.

38. At least 3,348 of the emails in question violate 15 U.S.C § 7704(a)(1) in that the Header Information contained or was accompanied by generic from names and false or misleading header information in the form of false or misleading domains, and false or misleading registration information.

39. At least 1,684 of the emails in question violate 15 U.S.C § 7704(a)(1) in that the Header Information contained or was accompanied by generic from names and privacy protected or concealed registration information.

40. Approximately 4,810 emails contain false and misleading "from" names.

    a. For example, an email with the header information including a from name "Your Amazon" and the subject heading "Go Shopping at Amazon with a $50 Gift Card" represents that the emails is from Amazon. However, upon closer inspection, when the email is opened, inconspicuous text hidden in the footer of the email states, "Amazon is a trademark who is not affiliated with this promotion."

    b. Many similar emails purport to come from recognized brands such as Wal-Mart, Kohls, Chili's, CNN, and Southwest Airlines, but do not provide links to the identified company, and instead, provide links to unrelated third parties.

41. The above accounts for at least 9,842 violations of the CAN-SPAM Act, section 7704(a)(1), though the actual number of violations is anticipated to be much higher.

42. Accordingly, XMission prays for relief in the amount of $100 per violation of 15 U.S.C § 7704(a)(1) pursuant to 15 U.S.C. § 7706(g)(3) in the amount of $984,200.

SLC_3106146

## SECOND CAUSE OF ACTION
**CAN-SPAM ACT, 15 U.S.C. § 7704(a)(1)(A)**

43. Each of the previous paragraphs is realleged herein.

44. The CAN-SPAM Act makes it unlawful to send email messages that contain, or are accompanied by, materially false or materially misleading Header Information.  15 U.S.C. §7704(a)(1).

45. "Header information that is technically accurate but includes an originating electronic mail address, domain name, or Internet Protocol address the access to which for purposes of initiating the message was obtained by means of false or fraudulent pretenses or representations shall be considered materially misleading."  15 U.S.C. § 7704(a)(1)(A).

46. In order to obtain the domain names from which to send emails, domain registrants are required to provide a name and address to the domain registrar for inclusion in the public WHOIS database.

47. The name and address provided by the domain registrant to the domain registrar constitute material representations.

48. Here, the registrants provided false names and/or addresses when they registered domains and therefore obtained access to use the domains to send email through a false representation in violation of §7704(a)(1)(A).

49. For example, the registrants used:

   a. addresses that, according to the Postmaster, are not affiliated with the registrant;

   b. addresses of unrelated third parties, such as grocery stores; and,

   c. false addresses.  For example, 269 emails were sent from domains purportedly owned by Bobby Watters with an address of 34 erf, fwfefs, NJ 07858, and 143

8

emails were sent from domains purportedly owned by Bobby Watersons with an address of 23 gedfdf, ffdf, NJ 08585.

50. The Defendants intended that the domain names were to be used, and the domain names were used, to send Spam emails in question.

51. Approximately 8,930 of the emails in question violate § 7704(a)(1)(A) because they originated from sender domains registered with false information.

52. Accordingly, XMission prays for relief in the amount of $100 per violation of 15 U.S.C § 7704(a)(1)(A) pursuant to 15 U.S.C. § 7706(g)(3) in the amount of $893,000.

## THIRD CAUSE OF ACTION
## CAN-SPAM ACT, 15 U.S.C. § 7704(a)(5)

53. Each of the previous paragraphs is realleged herein.

54. The CAN-SPAM Act requires that every commercial email contain a valid physical postal address of the "sender." 15 U.S.C. § 7704(a)(5)(A)(iii).

55. "Sender" is defined in 15 U.S.C. § 7702(16).

56. Approximately 6,614 of the emails in question did not contain any clearly and conspicuously displayed physical address.

57. Plaintiff suspects that discovery will show that the 9,762 emails that do contain a physical address do not contain a physical address of the "sender" as defined in 15 U.S.C. § 7702(16).

58. The above accounts for 16,376 violations of § 7704(a)(5).

59. Accordingly, XMission prays for relief in the amount of $25 per violation of 15 U.S.C § 7704(a)(5) pursuant to 15 U.S.C. § 7706(g)(3) in the amount of $409,400.

SLC_3106146

## FOURTH CAUSE OF ACTION
**Aggravated Damages – CAN-SPAM Act 15 U.S.C §7706(g)(3)(C)**

60. Each of the previous paragraphs is realleged herein.

61. On information and belief, each of the Defendants committed the violations set forth above willfully and knowingly; or, in the alternative, each of the Defendant's unlawful activity included one or more of the aggravated violations set forth in 15 U.S.C. § 7704(b).

62. Specifically:

   a. Defendants knew that they provided false names and addresses in registering domains from which to send emails in order to avoid detection by spam filtering services, law enforcement and private party plaintiffs such as XMission;

   b. Defendants knew that they had no affiliation with the recognized brands that they identified in the from lines of their emails;

   c. Defendant also knew that the physical addresses they provided in the bodies of the emails, if at all, were not the addresses of the "sender" as that term is defined in 15 U.S.C. § 7702(16) and as required by the CAN-SPAM Act.

63. Accordingly, XMission prays for treble damages of the total damage amount determined by this Court.

## REQUEST FOR RELIEF

Plaintiff respectfully requests the following relief:

A. Entry of judgment in the amount of $100 per violation of 15 U.S.C. § 7704(a)(1).

B. Entry of judgment in the amount of $100 per violation of 15 U.S.C. § 7704(a)(1)(A).

C. Entry of judgment in the amount of $25 per violations of 15 U.S.C. § 7704(a)(5).

D. Treble damages pursuant to 15 U.S.C. § 7706(g)(3).

SLC_3106146

E. Attorneys' fees and costs pursuant to 15 U.S.C. § 7706(g)(4).

F. Pre and post-judgment interest at the highest rate permitted by law.

G. Entry of permanent injunction against each Defendant prohibiting each Defendant from sending or causing to be sent email message to XMission and its customers.

H. All other relief deemed just in law or equity by this Court.

DATED this 30th day of January, 2017.

DURHAM JONES & PINEGAR, P.C.


/s/ Jordan K. Cameron
Jordan K. Cameron
*Attorneys for Plaintiff*

Plaintiff's Address:
51 East 400 South
Suite 200
Salt Lake City, Utah 84111